**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **MOE FARHOUD, STARK FIRS LIMITED PARTNERSHIP, ALDER VILLAGE, INC., STAR KREST, NIC., ASH STREET COURTYARD LLC, TYLER SHERMAN,** and **CRYSTAL SHERMAN**, | Case No. 3:20-cv-2226-JR<br><br>**OPINION AND ORDER** |
| Plaintiffs, | |
| v. | |
| **GOVERNOR KATE BROWN,** in her official capacity; **STATE OF OREGON; CITY OF PORTLAND,** an Oregon municipal corporation; and **MULTNOMAH COUNTY OF OREGON,** an Oregon municipal corporation, | |
| Defendants. | |

John DiLorenzo, Jr., Aaron K. Stuckey, and Evan Christopher, DAVIS WRIGHT TREMAINE LLP, 1300 SW Fifth Avenue, Suite 2400, Portland, OR 97201. Of Attorneys for Plaintiffs.

Keith Ketterling, Steven C. Berman, and Megan K. Houlihan, STOLL STOLL BERNE LOKTING & SHLACHTER PC, 209 SW Oak Street, Suite 500, Portland, OR 97204. Special Assistant Attorneys General and of Attorneys for Defendants Governor Kate Brown and State of Oregon.

Jenny M. Madkour, County Attorney for Multnomah County, and B. Andrew Jones, Senior Assistant County Attorney, MULTNOMAH COUNTY ATTORNEY'S OFFICE, 501 SE Hawthorne Boulevard, Suite 500, Portland, OR 97214. Of Attorneys for Defendant Multnomah County.

Naomi Sheffield, Senior Deputy City Attorney, PORTLAND CITY ATTORNEY'S OFFICE, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Of Attorneys for Defendant City of Portland.

**Michael H. Simon, District Judge.**

United States Magistrate Judge Jolie A. Russo issued Findings and Recommendations concluding that the Court should grant Defendants' motions to dismiss and deny Plaintiffs' motion for partial summary judgment. After Plaintiffs filed their objections and Defendants responded, Plaintiffs asked the Court to postpone its ruling on those objections until after the Supreme Court decided *Whole Woman's Health v. Jackson*. Plaintiffs stated that the Supreme Court's decision in that case would likely inform the Court's analysis of whether Plaintiffs have standing to sue Governor Brown. The Court agreed and permitted supplemental briefing from the parties on the applicability of *Whole Woman's Health* after the Supreme Court issued its decision. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021).

Under the Federal Magistrates Act (Act), the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1)(c). If a party objects to a magistrate judge's findings and recommendations, "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; Fed. R. Civ. P. 72(b)(3).

For those portions of a magistrate judge's findings and recommendations to which no party has objected, the Act does not prescribe any standard of review. *See Thomas v. Arn*, 474 U.S. 140, 152 (1985) ("There is no indication that Congress, in enacting [the Act], intended to require a district judge to review a magistrate's report to which no objections are filed."); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (holding that the court must review de novo magistrate judge's findings and recommendations if objection is made, "but not otherwise"). Although absent objections no review is required, the Act "does not preclude further review by the district judge[] *sua sponte* . . . under a *de novo* or any other standard."

*Thomas*, 474 U.S. at 154. Indeed, the Advisory Committee Notes to Fed. R. Civ. P. 72(b) recommend that "[w]hen no timely objection is filed," the Court reviews the magistrate judge's recommendations for "clear error on the face of the record."

For those portions of the Findings and Recommendations suggesting dismissal of Plaintiffs' claims against the State of Oregon and the City of Portland, there are no objections. The Court reviews those portions for clear error. Finding no such error, the Court adopts those portions of the Findings and Recommendations. For those portions of the Findings and Recommendations suggesting dismissal of Plaintiffs' claims against Governor Brown and Multnomah County, Plaintiffs objected. Plaintiffs object to the conclusion that their claims against Multnomah County are moot and that they lack standing to sue Governor Brown. Plaintiffs also object that the Findings and Recommendations did not address the merits of Plaintiffs' substantive arguments advanced in their opposition to Defendants' motions to dismiss and in support of Plaintiffs' motion for partial summary judgment.

For the reasons explained below, after de novo review, the Court declines to adopt the portion of the Findings and Recommendations concluding that Plaintiffs' claims against the County are moot but adopts the portion of the Findings and Recommendations concluding that Plaintiffs lack standing to sue Governor Brown. Because the Court holds that Plaintiffs' claims against the County are not moot, the Court discusses the merits of the County's motion to dismiss Plaintiffs' claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure and Plaintiffs' cross-motion for partial summary judgment on the right of access to courts. For the reasons explained below, the Court dismisses Plaintiffs' claims under Rule 12(b)(6).

## BACKGROUND

Beginning March 8, 2020, Governor Brown issued a series of executive orders in response to the COVID-19 pandemic. Executive Orders 20-03, 20-24, 20-30, 20-38, 20-67, 21-

05, 21-10, and 21-36 declared a state of emergency and repeatedly extended that state of emergency, with the most recent order extending the state of emergency to June 30, 2022. Governor Brown also issued Executive Orders 20-11, 20-13, and 20-56, which imposed a moratorium on residential evictions for nonpayment of rent between March 22, 2020 and June 30, 2020 and between September 30, 2020 and December 31, 2020.

The Oregon Legislature enacted similar protections for residential tenants in response to COVID-19. The Legislature first passed House Bill (H.B.) 4213, which implemented an eviction moratorium prohibiting landlords from evicting tenants for nonpayment of rent that accrued from April 1, 2020 to September 30, 2020 and gave tenants a grace period until March 31, 2021 to pay any unpaid rent that had accrued from April to September 2020. H.B. 4213 § 3. Later, the Legislature passed H.B. 4401, which extended the moratorium period from September 30, 2020 to June 30, 2021 and extended the grace period to pay any unpaid rent accrued during that time from March 31, 2021 to June 30, 2021. H.B. 4401 § 7(1). Further, under H.B. 4401, courts must dismiss any complaint filed by a landlord during the grace period that seeks possession of the property for nonpayment of rent, and landlords may not file any action during the emergency period to recover unpaid rent. *Id.* §§ 7(6), 8(2)(f). H.B. 4401 also established a landlord compensation fund. *Id.* § 2(1). Landlords may apply to the fund to receive 80 percent of unpaid rent accrued after April 1, 2020, if they agree to forgive the remaining 20 percent. H.B. 4401 does not provide any state official with enforcement authority and instead is only enforced by private rights of action. Later, the Legislature passed S.B. 282, which extended the grace period to pay rent accrued between April 1, 2020 and June 30, 2021 to February 28, 2022. S.B. 282 § 1. Next, the Legislature passed S.B. 278, which prohibited landlords from evicting residential tenants for up to 60 days based on nonpayment of rent if the tenant shows the landlord

documentation that the tenant has applied for emergency rental assistance. S.B. 278 § 2. Most

recently, the Legislature passed Senate Bill 891, which extends the period to submit rental

assistance documentation to landlords until June 30, 2022 and provides that landlords may not

evict those tenants if their rental assistance applications are still pending. S.B. 891 § 2. (The

Court takes judicial notice of S.B. 891, which was not mentioned by any party in their written

submissions. *See* Fed. R. Evid. 201.)

      Multnomah County (County) also enacted an eviction moratorium in response to

COVID-19. The County first adopted Ordinance 1282 in March 2020, which prohibited evictions

of residential tenants that had experienced a substantial loss of income due to COVID-19 and

gave those tenants a six-month grace period to pay any unpaid rent. Later, the County enacted

Ordinance 1284 to mirror the statewide eviction moratorium implemented through Governor

Brown's Executive Orders and the County's eviction moratorium. County Ordinance 1287 later

extended the grace period to pay unpaid rent to January 8, 2021 or the first day the County's

declared state of emergency was no longer in effect, whichever was later. The County then

enacted Ordinance 1292, which rescinded Ordinances 1282, 1284, and 1287. The County

replaced its prior ordinances with Ordinance 1296, which adopted the statewide moratorium

enacted in S.B. 278, prohibiting the eviction of tenants who had informed their landlords of a

pending application for rental assistance. County Ordinance 1296 extends the 60-day moratorium

period in S.B. 278 to 90 days and remains in effect until March 1, 2022.

      The City of Portland responded to COVID-19 with two ordinances extending the

County's eviction moratorium to all areas within the City of Portland, some of which extends

beyond Multnomah County. City Ordinance 189890 applied Multnomah County Ordinance 1282

to all areas within the City of Portland. Ordinance 189890 expired on the repeal of County

Ordinance 1282 on September 24, 2020. The City then enacted City Ordinance 190156, which applied Multnomah County Ordinance 1287 to all areas within the City of Portland. City Ordinance 190156 expired on February 1, 2021 and has not been replaced.

In this lawsuit, Plaintiffs assert claims under 42 U.S.C. § 1983 against Governor Brown, the State of Oregon, Multnomah County, and the City of Portland. In their First Amended Complaint, Plaintiffs contend that Defendants' eviction moratoria violate Plaintiffs' rights under several provisions of the United States Constitution. Plaintiffs allege violations of the Contracts Clause in section 10 of Article I, the Takings Clause in the Fifth Amendment, the Due Process Clause in the Fourteenth Amendment, the Unreasonable Seizure Clause in the Fourth Amendment, and the Petition Clause in the First Amendment.

## DISCUSSION

### A.  Governor Brown

The State argues that Plaintiffs lack standing to sue Governor Brown because she has no enforcement authority under H.B. 4401. Plaintiffs respond that they have standing because Governor Brown must "take care" that all laws of the state are executed. Plaintiffs also state that the Supreme Court's recent decision in *Whole Woman's Health* did not disturb this basis for standing. Although intertwined, standing and the exception to Eleventh Amendment immunity under *Ex parte Young* are distinct doctrines. *See Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104, 1108 (9th Cir. 1999) (explaining that *Ex parte Young* does not provide a basis for standing). The Court will first address whether Governor Brown is immune from suit in federal court under the Eleventh Amendment.

"Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021). Under the Eleventh Amendment, states are protected from suit in federal court. *See*

*Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1040 (9th Cir. 2003). In *Ex parte Young*,

the Supreme Court carved out an exception to Eleventh Amendment sovereign immunity for

suits seeking prospective injunctive relief against a state official in his or her official

capacity. 209 U.S. 123, 159-60 (1908). To sue a state official under *Ex parte Young*, that official

"must have some connection with the enforcement" of the challenged law and that connection

must be more direct than a "generalized duty to enforce state law or general supervisory power

over the persons responsible for enforcing the challenged provision." *L.A. Cnty. B. Ass'n v.*

*Eu*, 979 F.2d 697, 704 (9th Cir. 1992) (quoting *Ex parte Young*, 209 U.S. at 157). The Supreme

Court explained that to be subject to suit under *Ex parte Young*, the state official must possess

some enforcement authority over the challenged law. *See Whole Woman's Health*, 142 S. Ct.

at 534 (dismissing the state attorney general as immune from suit because "the petitioners do not

direct this Court to any enforcement authority the attorney general possesses in connection with

S.B. 8 that a federal court might enjoin him from exercising").

  The exception to Eleventh Amendment sovereign immunity under *Ex parte Young* does

not apply to Plaintiffs' claims against Governor Brown because she has no enforcement authority

over H.B. 4401. In *Whole Woman's Health*, the Supreme Court made clear that to sue a state

official under *Ex parte Young*, the plaintiff must point to some provision in the challenged law

that provides the official with enforcement authority. 142 S. Ct. at 534. The plaintiffs in *Whole*

*Woman's Health* challenged the constitutionality of S.B. 8, a Texas law that prohibited abortions

after six weeks. S.B. 8, however, differed from other laws restricting abortion because it was

enforceable only through a private right of action and conferred no enforcement authority on any

state official. The plaintiffs sued several defendants, including the Texas Attorney General and

state licensing officials. *Id.* at 530. The Supreme Court held that *Ex parte Young* did not apply to

the plaintiffs' claims against the state attorney general because that official had no enforcement authority in connection with S.B. 8. *Id.* at 534. The Supreme Court did, however, allow the claims against the licensing officials to proceed under *Ex parte Young* because those officials needed to take certain enforcement actions related to Texas's Health and Safety Code, which included S.B. 8. *Id.* at 535.

Here, like the state attorney general in *Whole Woman's Health*, Governor Brown has no enforcement authority under the challenged law. H.B. 4401, like S.B. 8, is enforced only through a private right of action. Thus, under *Whole Woman's Health*, the *Ex parte Young* exception to Eleventh Amendment immunity does not apply to Governor Brown. Plaintiffs, however, argue that despite *Whole Woman's Health*, three federal appellate court decisions remain good law and state that a private party may sue a state official under *Ex parte Young* on the sole basis that the state official has a general duty to "take care" that all laws of the state are faithfully executed. *See* Or. Const. art. V, § 10. The Court is not persuaded.

Plaintiffs first cite *Los Angeles County Bar Association v. Eu*, 979 F.2d 697 (9th Cir. 1992), in which the Ninth Circuit allowed claims to proceed against the Governor of California under *Ex parte Young*. The plaintiff in *Eu* challenged a California statute that prescribed the number of judges in Los Angeles County, arguing that the number of judges was unconstitutionally low. *Id.* at 699. The Ninth Circuit explained that the plaintiff could sue the Governor because, if the court held that the statute prescribed too few judges, the state legislature would need to amend the statute to provide for more judges, and the Governor would be statutorily bound to appoint judges to fill those positions. *Id.* at 704. Thus, the Ninth Circuit reasoned, the Governor had an adequate connection with the challenged law.

This conclusion, however, provides no assistance to Plaintiffs where here, Governor Brown is under no statutory obligation to carry out any part of H.B. 4401. Plaintiffs contend that Governor Brown's emergency powers under ORS Chapter 401 provide her with the authority to nullify H.B. 4401. But that argument speaks to the redressability prong of standing—whether Governor Brown is capable of redressing Plaintiffs' injuries—not Eleventh Amendment immunity. The fact that Governor Brown may have the *ability* to set aside H.B. 4401 or enact an identical emergency order subject to criminal penalties (*see* ORS § 401.990) does not show that H.B. 4401 affirmatively invests Governor Brown with any enforcement authority. Governor Brown's emergency powers therefore differ from the Governor of California's statutory obligation to appoint judges in *Eu*. Further, the Ninth Circuit in *Eu* expressly rejected the additional argument Plaintiffs advance here, when the court held that under *Ex parte Young*, the connection between the state official and challenged law "must be fairly direct" and that "a generalized duty to enforce state law . . . will not subject an official to suit." *Id.*

Plaintiffs also cite *Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656 (6th Cir. 1982), in which the Sixth Circuit allowed claims against the Governor of Ohio to go forward even though the statute at issue gave the Governor no enforcement authority. *Id.* at 665. The Sixth Circuit explained that there was a "sufficient connection" between the Governor and the challenged statute even "in the absence of specific state enforcement provisions" because there was a "substantial public interest in enforcing the trade practices legislation." *Id.* at 665 n.5. The Supreme Court's decision in *Whole Woman's Health*, however, undermines this holding, and the Ninth Circuit has already held that a state official may be sued under *Ex parte Young* only if that official has some connection more direct than a general duty to take care that the laws of the state are faithfully executed. *See Eu*, 979 F.2d at 704. The Court is bound by Ninth Circuit precedent.

Finally, Plaintiffs rely on *Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017), in which the Sixth Circuit concluded that *Ex parte Young* applied to some claims against the Governor of Michigan. The *Ex parte Young* issue in *Boler*, however, was whether the plaintiffs sought prospective injunctive relief or retroactive money damages and not whether the Governor had an adequate connection with the challenged law. *See id.* at 412-13. Further, the plaintiffs in *Boler* challenged the Governor's direct involvement with an ongoing water crisis in Flint, Michigan, and not the constitutionality of a statute over which the Governor had enforcement authority. *See id.* at 399-400. *Boler* therefore carries no persuasive weight.

In sum, because H.B. 4401 invests Governor Brown with no enforcement authority, *Ex parte Young* does not apply and she is immune from suit under the Eleventh Amendment. *See Whole Woman's Health*, 142 S. Ct. at 534; *Eu*, 979 F.2d at 704. Other courts have reached similar conclusions. *See, e.g.*, *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (concluding that *Ex parte Young* did not apply to the Governor of California because "his only connection to" the challenged law was "his general duty to enforce California law"); *Jevons v. Inslee*, --- F. Supp. 3d ---, 2021 WL 4443084, at *6 (E.D. Wash. Sept. 21, 2021), *appeal docketed*, No. 22-35050 (9th Cir. Jan. 18, 2022) (concluding that *Ex parte Young* did not apply to the plaintiff's claims against the Governor of Washington because the Governor had no enforcement authority over the challenged law beyond a "duty of general enforcement"); *Axos Bank v. Rosenblum*, 2020 WL 7344594, at *4 (D. Or. Dec. 14, 2020) (concluding that *Ex parte Young* did not apply to the plaintiff's claim against the Oregon Attorney General because she lacked enforcement authority over H.B. 4204, which is H.B. 4401's companion statute). Because Governor Brown is immune from suit, the Court need not address whether Plaintiffs have standing to sue Governor Brown.

**B. Multnomah County**

    **1. Mootness**

       Plaintiffs argue that their claims against Multnomah County are not moot because Multnomah County Ordinance 1296, which is in effect until March 1, 2022, is substantially similar to the County Ordinances at issue in Plaintiffs' Complaint. The County argues that Plaintiffs' claims against the County are moot because County Ordinances 1282, 1284, and 1287 have all expired and Ordinance 1296 materially differs from those expired Ordinances. For the reasons below, the Court agrees with Plaintiffs and concludes that Plaintiffs' claims against the County are not moot.

       "The doctrine of mootness, which is embedded in Article III's case or controversy requirement, requires that an actual, ongoing controversy exist at all stages of federal court proceedings." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011). "A case becomes moot 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome' of the litigation." *Id.* (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). A defendant's voluntary cessation of challenged conduct does not always moot the case. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant . . . free to return to his old ways." (simplified) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982))).

       Courts presume a claim is moot when a government actor has voluntarily ceased the challenged conduct "unless there is a reasonable expectation that the legislative body is likely to enact the same or substantially similar legislation in the future." *Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1197 (9th Cir. 2019). If a government actor

has in fact enacted substantially similar legislation that inflicts essentially the same harm on plaintiffs but only to a lesser degree, the case is not moot. *See N.E. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993) (holding that the plaintiffs' claim challenging repealed legislation was not moot because the legislature enacted new legislation that "disadvantaged [the plaintiffs] in the same fundamental way," even though to a "lesser degree"); *Cuviello v. City of Vallejo*, 944 F.3d 816, 824 (9th Cir. 2019) ("If the amended ordinance threatens to harm a plaintiff in the same fundamental way—even if to a lesser degree—the plaintiff will still have a live claim for prospective relief.").

Plaintiffs' claims against Multnomah County are not moot because County Ordinance 1296 is substantially similar to the now-expired County Ordinances at issue in Plaintiffs' Complaint. The County Ordinances at issue in the Complaint—Ordinances 1282, 1284, and 1287—imposed a moratorium on all evictions of residential tenants for nonpayment of rent for a six-month grace period beginning after the County's declared emergency period ended. County Ordinance 1296 essentially inflicts the same alleged harm to Plaintiffs but in a slightly different way. Under County Ordinance 1296, landlords may not evict residential tenants for up to 90 days if the tenant notifies the landlord before March 1, 2022 that he or she has applied for rental assistance. Both the expired Ordinances and the currently effective Ordinance 1296 impose the same type of harm because they substantially restrict Plaintiffs' ability to evict nonpaying tenants and Ordinance 1296 is merely a continuation of the prior Ordinances but with slightly different terms. That Ordinance 1296 prohibits evictions of a more limited group of tenants does not alter this conclusion because Ordinance 1296 still essentially inflicts the same alleged harm on Plaintiffs, only to a lesser degree. *See N.E. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 662; *Cuviello*, 944 F.3d at 824; *Jevons*, 2021 WL 4443084, at *5

(concluding that the landlords' challenge to the Governor of Washington's then-expired eviction moratoria was not moot because the Governor had imposed a substantially similar new moratorium, even though "under different conditions"). Thus, Plaintiffs' claims against the County are not moot.

## 2. Failure to State a Claim

### a. Standards

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

### b.  Contracts Clause

"The Contracts Clause restricts the power of States to disrupt contractual arrangements." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). Courts apply a two-step test to determine whether the challenged law violates the Contracts Clause. *See id.* The first question is whether the law at issue amounts to a "substantial impairment" of the contractual relationship. *Id.* at 1821-22. To determine whether the law amounts to a substantial impairment, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.* at 1822. Next, if the law is a substantial impairment to the contractual relationship, the second question is whether the law was "drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Id.* (simplified) (quoting *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-12 (1983)).

### i.  Substantial Impairment

Here, the County's eviction moratoria (collectively, the Eviction Moratorium) substantially impair Plaintiffs' contractual relationships. First, the Eviction Moratorium significantly undermines the parties' contractual bargain. Although the County argues that the Eviction Moratorium does not permanently forgive tenants' obligation to pay back unpaid rent, Plaintiffs allege many of their tenants will never pay back the accrued rent and simply find

housing elsewhere at the end of the moratorium period. *See* ECF 17, ¶ 3 ("[E]ven with regard to the rent and other expenses Plaintiffs could, eventually, sue to recover, the practical reality is that the tenants who cannot afford to pay one month's rent now will be highly unlikely to afford the total of past-due rent that will continue to accumulate each month until the State declares the 'end' of the statewide emergency. Plaintiffs' 'right' to unpaid rent is little more than an illusion."); ECF 17, ¶ 33 ("[T]he cost of the governments' failure to act has continued to fall on Plaintiffs' shoulders, all of whom have been left to their own devices. On the other hand, Defendants have continued to subsidize other, more politically favored, segments of society that have also been impacted by Defendants' responses to the pandemic."); *see also Melendez v. City of New York*, 16 F.4th 992, 1033 (2d Cir. 2021) (reversing the district court's dismissal of the plaintiffs' Contracts Clause challenge to New York's prohibition on enforcement of personal guarantees on commercial leases for a 16-month period during the COVID-19 pandemic and stating, "the practical likelihood of landlords" recovering the unpaid rent "appears speculative at best"). The Eviction Moratorium by its terms extinguished a tenant's obligation to pay rent during the moratorium period, which Plaintiffs allege effectively extinguished Plaintiffs' prospect of ever recovering that unpaid rent. And under the current terms of the Eviction Moratorium, that grace period is extended by an additional 90 days so long as the tenant attests to the landlord that he or she has submitted a pending application rental assistance.

The second factor, whether the Eviction Moratorium interferes with Plaintiffs' reasonable expectations, also tips in Plaintiffs' favor. Laws that interfere with contracts of highly regulated industries are less likely to substantially impair those contracts. *See Energy Reserves Grp.*, 459 U.S. at 411 ("In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past."). Even assuming that

residential tenant leasing is a heavily regulated industry, the nature of the Eviction Moratorium differs in a material way from prior government regulation of residential tenant leasing and therefore still interferes with Plaintiffs' reasonable expectations. Oregon law regulates many aspects of the landlord-tenant relationship, such as the types of payment the landlord may require, the imposition of late fees, the landlord's duty to maintain the property in a habitable condition, rent increases, and utility and service charges, among others. *See generally* ORS Ch. 90. No part of ORS Chapter 90, however, before the State's COVID-19 legislation, prohibited landlords from evicting non-paying tenants. Thus, even though state law regulates many aspects of the landlord-tenant relationship, Plaintiffs had no reasonable expectation that their ability to collect rent or otherwise initiate eviction proceedings for nonpayment of rent would be impaired.

Third, the moratorium prevents Plaintiffs from safeguarding their contractual rights. Plaintiffs allege their contractual rights include the ability to receive the agreed-upon rent monthly. *See* ECF 17, ¶ 3. Plaintiffs also allege that as landlords, they incur regular expenses such as payment on the mortgage for the rental property, utility charges, repair and maintenance costs, property taxes, and property management fees. ECF 17, ¶ 52. The Eviction Moratorium by its terms does not safeguard Plaintiffs' contractual right to receive rent monthly because Plaintiffs may not evict tenants who have not paid rent for months at a time. Further, although the Eviction Moratorium allows Plaintiffs to seek repayment of unpaid rent after the moratorium and grace period expires, this does little to safeguard Plaintiffs' rights. Plaintiffs allege that the "tenants who cannot afford to pay one month's rent now will be highly unlikely to afford the total of past-due rent" that accrues during a period which now approaches two years. ECF 17, ¶ 3. The moratorium therefore differs from other laws found to safeguard contractual rights, such

PAGE 16 – OPINION AND ORDER

as recording statutes, because it does more than impose "minimal paperwork burdens" in order to receive monthly rent. *See Sveen*, 138 S. Ct. at 1823. Thus, the Eviction Moratorium substantially impairs Plaintiffs' contractual relationships.

Moreover, the Eviction Moratorium mirrors the foreclosure moratorium struck down by the Supreme Court in *W.B. Worthen Co. ex rel. Board of Commissioners of Street Improvement District No. 513 of Little Rock v. Kavanaugh*, 295 U.S. 56 (1935). The foreclosure moratorium in *Worthen*, enacted during a state of emergency following the Great Depression, extended the period between default and foreclosure from 65 days to two and a half years. *Id.* at 61. The moratorium also permitted the debtor to remain in "undisturbed possession" of the property "without a dollar for the creditor" during that time without "even a requirement that the debtor [] satisfy the court of his inability to pay." *Id.* The Supreme Court explained that the moratorium, which removed "nearly all the incidents that give attractiveness and value to collateral security," differed from the foreclosure moratorium upheld in *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934). *Id.* at 62. The Supreme Court in *Worthen* explained that the moratorium in *Blaisdell* did not violate the Contracts Clause because it retained some benefits to the creditor during the moratorium period and restricted the debtor's ability to benefit from the moratorium. *Id.* at 63. In *Blaisdell*, the foreclosure moratorium only empowered a court to stay foreclosure if the debtor could show his or her necessity and required the debtor to pay the fair rental value for the property if he or she remained in possession before foreclosure. *Id.*

Here, unlike the moratorium in *Blaisdell*, tenants need not show to a court during eviction proceedings that he or she has in fact experienced financial hardship as a result of the COVID-19 pandemic. Like the moratorium in *Worthen*, the Eviction Moratorium removes nearly all benefits of the contractual bargain that benefit the landlord during the moratorium period. A tenant may

remain in possession of the property with no payment to the landlord, and since the enactment of
County Ordinance 1296, to remain in possession, tenants need only attest to their landlords that
they have applied for rental assistance. Because the Eviction Moratorium substantially impairs
Plaintiffs' contractual relationships, the Court now considers whether it is a reasonable way to
advance a significant and legitimate public purpose. *See Sveen*, 138 S. Ct. at 1822.

### ii. Appropriate and Reasonable Way to Advance Significant and Legitimate Public Purpose

The Ninth Circuit recently addressed a Contracts Clause challenge to a nearly identical
eviction moratorium in California. In *Apartment Association of Los Angeles County, Inc. v. City
of Los Angeles*, 10 F.4th 905 (9th Cir. 2021), the Ninth Circuit affirmed the district court's denial
of the plaintiff's motion for a preliminary injunction, concluding that the plaintiff was not likely
to succeed on the merits of its Contracts Clause claim. *Id.* at 908. The Ninth Circuit concluded
that the eviction moratorium did not violate the Contracts Clause because even if it amounted to
a substantial impairment of the plaintiff's contracts, it still was an "appropriate and reasonable
way to advance a significant and legitimate public purpose." *Id.* at 913 (quoting *Sveen*, 138 S. Ct.
at 1822). In reaching that conclusion, the court examined the history of Contracts Clause
jurisprudence, noting that the Supreme Court has over the last century "significantly curtail[ed]
the Contracts Clause's prohibitive force." *See id.* at 912-13. The Ninth Circuit explained that the
defendant had "fairly tie[d] the moratorium to its stated goal of preventing displacement from
homes, which the City reasonably explain[ed] can exacerbate the public health-related problems
stemming from the COVID-19 pandemic." *Id.* at 914.

Like the plaintiff in *Apartment Association*, Plaintiffs here do not challenge that the
Eviction Moratorium's purpose is a significant and legitimate public purpose. Instead, Plaintiffs
argue that the Eviction Moratorium is an unreasonable means to reach the County's legitimate

end. The Eviction Moratorium states that the moratorium is "necessary to avoid mass evictions for non-payment of rent directly attributed to the lingering impacts of [the] COVID-19 pandemic, promote housing stability, and protect the health and safety of community members in Multnomah County." County Ordinance 1296. The County, like the defendant in *Apartment Association*, reasonably ties the eviction moratorium to its stated end of preventing mass-evictions and protecting Multnomah County residents' health and safety. *See Apartment Association*, 10 F.4th at 914. Thus, even if the Eviction Moratorium substantially impairs Plaintiffs' contractual relationships, it still is an appropriate and reasonable way to advance the County's legitimate public purpose.

### c.  Takings Clause

Plaintiffs assert a claim under the Takings Clause, alleging that the Eviction Moratorium constitutes a per se taking without just compensation. The County argues that the moratorium is not a per se taking because it only regulates the economic relationship between landlord and tenant and does not authorize unwanted physical occupation of the landlord's property. The County also contends the moratorium only imposes a temporary limitation on Plaintiffs' rights and is therefore not a per se taking under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982). The County also argues that Plaintiffs may not seek injunctive relief for their Takings Claim under *Knick v. Township*, 139 S. Ct. 2162 (2019).

### i.  Whether the County Moratorium Constitutes a Per Se Taking

The Fifth Amendment provides: "Nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Supreme Court recognizes two types of takings under the Fifth Amendment: physical, or per se, takings and regulatory takings. *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071-72 (2021) (explaining the standards for determining whether government action is a physical or regulatory taking). A physical taking

PAGE 19 – OPINION AND ORDER

occurs when the government condemns property by eminent domain, takes possession of property for itself or someone else, or occupies property. *Id.* Regulatory takings, on the other hand, occur when the government "imposes regulations that restrict an owner's ability to use his own property."[1] *Id.*

Last term, in *Cedar Point*, the Supreme Court addressed whether a California law requiring agricultural employers to open their property to union organizers for up to three hours per day, 120 days per year amounted to a physical taking. *Id.* at 2069. The Supreme Court held that it did. *Id.* at 2077. Under the challenged law, after filing the proper notice with the state Agricultural Labor Relations Board, union organizations gained the right to "take access" to an agricultural employer's property and were "free to meet and talk with employees as they wish[ed]." *Id.* at 2069. The law required agricultural employers to open their property to these organizers, no matter if their employees lived on the property. *See id.* The Supreme Court explained that the California law constituted a physical taking because it nullified the agricultural employer's right to exclude union organizers from their property. *Cedar Point*, 141 S. Ct. at 2076. The right to exclude, the Supreme Court explained, is one of the most "treasured," "fundamental," and "essential" rights of property ownership. *Id.* at 2072. By temporarily extinguishing the property owner's right to exclude, the Court held, the government must provide just compensation. *Id.* at 2073.

The County argues that the Supreme Court's decision in *Yee v. City of Escondido*, 503 U.S. 519 (1992), governs Plaintiffs' takings claim, not *Cedar Point*. The Court agrees. The plaintiffs in *Yee* challenged a mobile home rent control ordinance, arguing that the inability to increase rent at the rate they desired permitted existing tenants to remain on their property

---

[1] Plaintiffs do not argue that the Eviction Moratorium is a regulatory taking, so the Court will not address that issue.

indefinitely and later realize more profit when those tenants later sold their mobile homes. *Id.* at 525. The Supreme Court held that the rent control ordinance was not a physical taking. *Id.* at 527. The Court explained that the rent control ordinance only regulated the economic relationship between landlord and tenant but did not compel the mobile home park owners to continue renting to their tenants and could still evict those tenants. *Id.* at 527-28. The Court also noted that a "different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Id.* at 528.

Like the park owners in *Yee*, Plaintiffs here voluntarily invited their tenants onto their property. This fact draws a critical distinction from *Cedar Point*, which conferred a unilateral right on third parties to take access of an employer's property. The Eviction Moratorium here grants no right to third parties to access Plaintiffs' properties. Instead, only those tenants to whom Plaintiffs have already granted possession may remain on Plaintiffs' property. Moreover, Plaintiffs may still evict tenants for reasons other than nonpayment of rent and thus retain their right to exclude. In other words, the moratorium does not compel Plaintiffs "over objection to rent [their] property" or prohibit them "in perpetuity from terminating a tenancy." *Id*; *see also Ballinger v. City of Oakland*, --- F.4th ---, 2022 WL 289180, at *3-4 (9th Cir. 2022) (holding that an ordinance requiring landlords to pay tenants' relocation costs was not a physical taking and stating, "'[w]hen a person voluntarily surrenders liberty or property,' like when the Ballingers chose to rent their property causing them to pay the relocation fee when they caused the tenants to relocate, 'the State has not *deprived* the person of a constitutionally protected interest'" (emphasis in original) (quoting *L.L. Nelson Enters., Inc. v. County of St. Louis*, 673 F.3d 799, 806 (8th Cir. 2012))). Plaintiffs, therefore, fail to allege a physical, or per se, taking.

### ii. Injunctive Relief

Plaintiffs' takings claim also fails because they only seek declaratory and injunctive relief, which is generally unavailable under the Takings Clause. *See Knick v. Township of Scott*, 139 S. Ct. 2162, 2176 (2019). Plaintiffs argue that courts may enjoin a taking when the government has taken the property not for "public use," citing *Ross v. City of Berkeley*, 655 F. Supp. 820, 839-40 (N.D. Cal. 1987). *Ross*, however, does not address injunctive relief. Instead, it considers what standard courts should apply when assessing whether the government had taken property for public use. *Id.* The court explained that to show there was no "public use" under *Hall v. City of Santa Barbara*, 833 F.2d 1270 (9th Cir. 1986), a plaintiff need only show that the government took the property not for a "legitimate state interest" (rather than with no rational basis) if the government had accomplished the taking through means other than intentional eminent domain. *Ross*, 655 F. Supp. at 839-40. The authority on which the Ninth Circuit relied on in *Hall*, however, was later abrogated by the Supreme Court in *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540 (2005) (overruling the "legitimate state interest" requirement in *Agins v. City of Tiburon*, 447 U.S. 255 (1980)).

Plaintiffs also draw the Court's attention to an additional nuance in the analysis of the general prohibition against injunctive relief for takings claims discussed in *Knick*. In *Cedar Point*, which was decided two years after *Knick*, the Supreme Court reversed the dismissal of the plaintiffs' takings claim, which only sought declaratory and injunctive relief. *Cedar Point*, 141 S. Ct. at 2070. On remand, the district court entered a judgment declaring the access regulation unconstitutional and enjoining enforcement of the regulation against the plaintiffs. *Cedar Point Nursery v. Hassid*, 1:16-cv-185-JLT-BAM, ECF 39.

Plaintiffs here argue that the relief awarded in *Cedar Point* may conflict with the Supreme Court's prior statement in *Knick* that injunctive relief is generally not available under

the Takings Clause and that "governments need not fear that courts will enjoin their activities." *See Knick*, 139 S. Ct. at 2168.

      *Cedar Point*, however, is consistent with *Knick* because *Knick* provides only that injunctive relief is not available under the Takings Clause if there are adequate means to obtain "just compensation." *See id.* at 2168 ("So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities."); *id.* at 2176 ("As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking."); *id.* at 2177 ("Given the availability of post-taking compensation, barring the government from acting will ordinarily not be appropriate."). The Supreme Court in *Cedar Point* did not address whether just compensation was available, either because the parties did not raise that issue or because the Supreme Court was satisfied that there was no adequate means to obtain just compensation for a temporary but recurring physical taking of the plaintiffs' property under the specific facts presented in that case. In other words, the Supreme Court in *Cedar Point* effectively applied the exception to the general rule stated in *Knick*.

      Here, Plaintiffs have alleged no facts showing that even if the Eviction Moratorium did amount to a physical taking, they have no access to adequate means of obtaining just compensation. Plaintiffs' Takings Clause claim, therefore, fails because it only seeks injunctive relief. *See Or. Rest. & Lodging Ass'n v. Brown*, 2020 WL 6905319, at *6 (D. Or. Nov. 24, 2020) (dismissing Takings Clause claim challenging Governor Brown's eviction moratorium because the plaintiffs only sought injunctive relief).

### d.  Arbitrary and Confiscatory Price Controls

      Plaintiffs also bring a claim under the Fourteenth Amendment, alleging that the Eviction Moratorium amounts to a confiscatory price control in violation of their due process rights. A

price control law violates the Fourteenth Amendment if it is "arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt." *Nebbia v. People of New York*, 291 U.S. 502, 539 (1934). Rent control is a form is price control. *See Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1043 (9th Cir. 2000) (Fletcher, J., concurring) ("An ordinary rent control law is constitutionally indistinguishable from a price control law."); *Adamson Cos. v. City of Malibu*, 854 F. Supp. 1476, 1485 (C.D. Cal. 1994) ("Rent control is a form of price-control regulation."). Plaintiffs' price control claim fails because the Eviction Moratorium does not impose rent control or other form of price control. The moratorium prohibits eviction for nonpayment of rent while in effect but does not regulate the price of rent that Plaintiffs and their tenants may negotiate.

### e.  Unreasonable Seizures

Plaintiffs also bring a claim under the Fourth Amendment, alleging the County unreasonably seized their property. To state a claim under the Fourth Amendment, Plaintiffs must allege that "a seizure occurred and that it was unreasonable." *Cedar Point Nursery v. Shiroma*, 923 F.3d 524, 534 (9th Cir. 2019), *rev'd on other grounds*, 141 S. Ct. 2063 (2021). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). The Ninth Circuit has explained that the Fourth Amendment applies only to government conduct carried out in an investigatory capacity:

> The phrase "searches and seizures" connotes that the type of conduct regulated by the fourth amendment must be somehow designed to elicit a benefit for the government in an investigatory or, more broadly, an administrative capacity. Thus, unlike the "state actor" requirement of the fourteenth amendment, the fourth amendment cannot be triggered simply because a person is acting on behalf of the government. Instead, the fourth amendment will only apply to governmental conduct that can reasonably be characterized as a "search" or a "seizure."

*United States v. Attson*, 900 F.2d 1427, 1429 (9th Cir. 1990). The Ninth Circuit emphasized the limited applicability of the Fourth Amendment to conduct not related to a criminal investigation:

> "Only rarely . . . has the [Supreme] Court considered the nature of fourth amendment restrictions on the conduct of government officials in noncriminal investigations." *The Supreme Court, 1986 Term-Leading Cases*, 101 Harv. L. Rev. 119, 230 (1987). Even rarer are the instances in which the Court has considered the application of the fourth amendment to noncriminal *noninvestigatory* governmental conduct. Yet, when the Court has considered the application of the fourth amendment to governmental conduct in a noncriminal context, it has been careful to observe that the application of the amendment is limited.

*Id.* at 1430 (emphasis in original). To be subject to the Fourth Amendment, the government must intend for its conduct to be a "search or seizure, be it in the context of a criminal investigation or an administrative inspection." *Id.* at 1431. The Ninth Circuit has continued to apply the rule laid out in *Attson* to determine whether non-law enforcement government conduct is subject to the Fourth Amendment. *See Mann v. County of San Diego*, 907 F.3d 1154, 1164 (9th Cir. 2018) (citing *Attson* and concluding that the Fourth Amendment applied to medical examinations because they were "at least partially investigatory"); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 924 (9th Cir. 2001) ("[F]or the conduct of a non-law enforcement governmental party, such as Ruiz, to be subject to the Fourth Amendment, Arpin must show that Ruiz acted 'with the intent to assist the government in its investigatory or administrative purposes, and not for an independent purpose.'" (quoting *Attson*, 900 F.2d at 1433)).

Plaintiffs have alleged no facts showing that the County enacted the moratorium to act in an investigatory capacity related to any criminal or administrative investigation. Plaintiffs, therefore, fail to state a claim under the Fourth Amendment. *See id.*

**f.  Right of Access to the Courts**

Plaintiffs also bring a claim for a violation of the right to access the courts under the

Petition Clause of the First Amendment and the Due Process Clause of the Fourteenth

Amendment. Although the source of the right to access the courts remains "unsettled," to state a

right of access claim, the plaintiff must allege facts showing "official action is presently denying

an opportunity to litigate for some class of potential plaintiffs" and he or she has a nonfrivolous

underlying claim. *Christopher v. Harbury*, 536 U.S. 403, 413, 415 (2002). A delayed ability to

litigate, rather than an outright prohibition, does not violate the Constitution. *See Sosna v.*

*Iowa*, 419 U.S. 393, 410 (1975) (distinguishing between "total deprivation" of access to divorce

courts due to a filing fee and delay in access to divorce courts due to one-year residency

requirement); *Eu*, 979 F.2d at 706 (stating that "we can find no basis in the Constitution for a

rigid right to resolution of all civil claims" within a certain time).

Plaintiffs argue the Eviction Moratorium violates their right to access the courts because

it prohibits landlords from initiating eviction proceedings for nonpayment of rent. The

moratorium, however, does not permanently remove Plaintiffs' ability to access the courts for all

purposes. Plaintiffs may initiate eviction proceedings for reasons other than nonpayment of rent

and may file breach of contract actions against tenants.[2] The moratorium therefore does not

violate Plaintiffs' right to access the courts under the First or Fourteenth Amendments. *See*

*Heights Apartments, LLC v. Walz*, 510 F. Supp. 3d 789, 811 (D. Minn. 2020) ("Because the

[Executive Orders] foreclose the Landlords' ability to obtain only one kind of relief and only

---

[2] Plaintiffs argue that H.B. 4401 and the later local moratoria that adopted H.B. 4401 preclude them from filing breach of contract lawsuits against nonpaying tenants. The County responds that no provision in the operative County ordinance (Ordinance 1296), which refers to S.B. 278, bars any landlord from suing and alleging breach of contract by nonpayment. The Court has identified no provision of County Ordinance 1296 that prohibits any landlord from bringing such a lawsuit.

does so temporarily, the EOs do not violate the Petition Clause."); *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 174 (S.D.N.Y. 2020) ("Although nonpayment proceedings have been suspended, Plaintiffs can still sue their tenants for arrearages through a breach of contract action in the New York Supreme Court – and the fact that is not their preferred remedy is of no moment. They will also have the opportunity to bring eviction proceedings for reason of nonpayment once the order expires, a right preserved by the portion of EO 202.28 that extends relevant statutes of limitation for the duration of court closures.").

## CONCLUSION

The Court ADOPTS IN PART the Findings and Recommendation (ECF 54). The Court GRANTS all pending Motions to Dismiss (ECF 18, 19, 21) and DENIES Plaintiffs' Partial Motion for Summary Judgment (ECF 33). If Plaintiffs believe that they can cure the deficiencies identified in this Opinion and Order, Plaintiffs may file a Second Amended Complaint within two weeks from the date of this decision.

**IT IS SO ORDERED.**

DATED this 3rd day of February, 2022.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge